No. 96,772

Iron Horse Auto, Inc., *Appellee*, v. Lititz Mutual Insurance Co., *Appellant*, and Capital City Bank, *Appellee*, v. Lititz Mutual Insurance Co., *Appellant*, and Iron Horse Auto, Inc., and William Frye and Peggy Frye, Husband and Wife, *et al.*, *Appellees*.

(156 P.3d 1221)

Opinion filed April 27, 2007.

*Steve R. Fabert*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, argued the cause and was on the briefs for appellant.

*Todd A. Luckman*, of Stumbo, Hanson & Hendricks, L.L.P., of Topeka, argued the cause and was on the briefs for appellee Capital City Bank.

*Charles N. Henson* and *Allison M. Kenkel*, of Wright, Henson, Clark, Hutton, Mudrick & Gragson, LLP, of Topeka, were on the brief for *amicus curiae* The Kansas Bankers Association.

The opinion of the court was delivered by

JOHNSON, J.: Lititz Mutual Insurance Company (Insurance Company) appeals from the summary judgment in favor of Capital City Bank (Bank), whereby the district court found that the Insurance Company's commercial insurance policy provided for a loss payment to the Bank, as mortgageholder, notwithstanding the named insured's filing of a fraudulent claim. The Insurance Company contends that K.S.A. 40-2,118(c) excused the payment to the Bank and, further, that the policy provisions and endorsements specifically excluded coverage for the Bank. Disagreeing on both counts, we affirm.

Iron Horse Auto, Inc. (Named Insured) owned improved real estate as part of its used car dealership business operations. It had a commercial insurance policy with Insurance Company providing, *inter alia*, fire insurance on its office building with a policy limit of $79,500. The policy also identified William Frye as a named insured and listed the Bank as a "Mortgagee Holder" on the insured building.

The Named Insured owed money to the Bank upon two promissory notes secured by real estate mortgages on the dealership's improved commercial property. The mortgages required the Named Insured to procure and maintain a fire and extended coverage insurance policy on the real estate improvements with the specific requirement that the policy have "a standard mortgagee clause in favor of Lender." Further, the mortgage directed that "[e]ach insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person."

After the Insurance Company denied certain claims, including one for a fire loss, the Named Insured filed suit against its insurer. The Insurance Company defended on the basis that Frye and/or his wife had participated in setting the fire which caused the claimed loss. The Bank intervened and filed a Third Party Petition which included a breach of contract claim against the Insurance Company for failing to pay the Bank's damages pursuant to the mortgageholder provisions in the policy.

Subsequently, the district court granted the Bank's partial summary judgment motion, finding that the Insurance Company had

to pay the Bank under the policy's standard mortgage clause, regardless of whether the Named Insured's claim was fraudulent. The Bank did not participate in the ensuing trial, where the jury found in favor of the Insurance Company. The court entered judgment for the Bank against the Insurance Company in the amount of $43,987.15 plus interest. The Insurance Company appealed that judgment, and we granted its motion to transfer the case to this court.

## STANDARD MORTGAGE CLAUSE

The Insurance Company's overarching theme in this appeal is an attack upon the judicial recognition and application of an insurance policy provision commonly referred to as a "standard mortgage clause" or a "union mortgage clause." Such a clause provides that a mortgagee will be paid for a covered loss notwithstanding the insurer's right to deny the named insured's claim based upon the named insured's acts or noncompliance with the policy's terms. A popular treatise on insurance law provides some insight, as follows:

> "Many policies insuring property contain provisions which purport to protect the mortgagee against loss from causes insured against. . . .
>
> "The ordinary mortgage or loss-payable clause merely provides in effect that the proceeds of the policy shall be paid first to the mortgagee as his or her interest may appear; but the so-called 'standard' or 'union' mortgage clause is somewhat more specific, in that it also provides that the mortgagee shall be protected against loss from any act or neglect of the mortgagor or owner, so that it shall not defeat the insurance so far as the interest of the mortgagee is concerned." 4 Couch on Insurance 3d § 65:8, pp. 65-16 to 65-17 (1996).

See 44 Am. Jur. 2d, Insurance § 1049, p. 297.

The union mortgage clause in an insurance policy creates a separate contract between the mortgagee and the insurer. *Vargas v. Nautilus Ins. Co.*, 248 Kan. 881, 887, 811 P.2d 868 (1991); see also *Nieses v. Solomon State Bank*, 236 Kan. 767, 778, 696 P.2d 372 (1985) ("Kansas follows the majority rule, *i.e.*, that a standard mortgage clause operates as a distinct and separate contract between the insurer and the mortgagee."); *Fancher v. Carson-Campbell, Inc.*, 216 Kan. 141, 144, 530 P.2d 1225 (1975) ("We have been

consistent in holding that [a union mortgage clause] creates a new and independent contract which entitles the mortgagee to recover under the policy of insurance, notwithstanding the effect of any act or neglect on the part of the owner or mortgagor of the property."); *Wunschel v. Transcontinental Ins. Co.*, 17 Kan. App. 2d 457, 463, 839 P.2d 64 (1992). The Insurance Company describes this long-standing and well-settled contract interpretation as "an archaic vestige of 19th Century law."

The policy at issue here has a section entitled, "**Mortgagehold-ers**," which provides, in relevant part, as follows:

"b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

. . . .

"d. If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

  (1) Pays any premium due under this Coverage Part at our request if you have failed to do so;

  (2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

  (3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

  All of the terms of this Coverage Part will then apply directly to the mortgageholder.

"e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

  (1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

  (2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

  At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us."

An endorsement changed the language of subsection (b) to read:

"4. Paragraph b. in the Mortgageholders Additional Condition in the Building And Personal Property Coverage Form is replaced by the following:

  "b. We will pay for covered loss of or damage to buildings or structures to:

(1) The Insurance Trustee for the benefit of each Townhouse Owner;
(2) The holder of each first mortgage; and
(3) The Association;
as interests may appear and as shown in the Townhouse Declaration."

## STATUTORY PROVISIONS

One of the Insurance Company's contentions is that the 1994 amendments to the Fraudulent Insurance Act (Act), K.S.A. 40-2,118 *et seq.*, were intended to abolish judicial recognition of union mortgage clauses in this state. K.S.A. 40-2,118 provides:

"(a) For purposes of this act a 'fraudulent insurance act' means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto.

"(b) Except as otherwise specifically provided in K.S.A. 21-3718 and amendments thereto and K.S.A. 44-5,125 and amendments thereto, a fraudulent insurance act shall constitute a severity level 6, nonperson felony if the amount involved is $25,000 or more; a severity level 7, nonperson felony if the amount is at least $5,000 but less than $25,000; a severity level 8, nonperson felony if the amount is at least $1,000 but less than $5,000; a severity level 9, nonperson felony if the amount is at least $500 but less than $1,000; and a class C nonperson misdemeanor if the amount is less than $500.

"(c) In addition to any other penalty, a person who violates this statute shall be ordered to make restitution to the insurer or any other person or entity for any financial loss sustained as a result of such violation. *An insurer shall not be required to provide coverage or pay any claim involving a fraudulent insurance act.*

"(d) This act shall apply to all insurance applications, ratings, claims and other benefits made pursuant to any insurance policy." (Emphasis added.)

## STANDARDS OF REVIEW/RULES OF CONSTRUCTION

The interpretation of a statute is a question of law over which this court has unlimited review. *Foster v. Kansas Dept. of Revenue,* 281 Kan. 368, 374, 130 P.3d 560 (2006). Interpretation of an insurance contract is a question of law over which an appellate court

has de novo review. *Marshall v. Kansas Med. Mut. Ins. Co.*, 276 Kan. 97, 111, 73 P.3d 120 (2003).

In construing an insurance policy, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished. *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 575, 56 P.3d 789 (2002). Insurance policy language is tested by what a reasonably prudent insured would understand the language to mean, not by what the insurer intended the language to mean. *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, Syl. ¶ 3, 46 P.3d 1120 (2002).

Our rules of statutory interpretation are well settled and oft repeated.

" 'The fundamental rule of statutory construction to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed rather than determine what the law should or should not be.' *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 (2003)." *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 88, 106 P.3d 492 (2005).

To the extent K.S.A. 40-2,118 can be considered a criminal statute, it would be subject to the general requirement of strict construction, *i.e.*, " '[a]ny reasonable doubt about the meaning is decided in favor of anyone subjected to the criminal statute.' " *State v. McCurry*, 279 Kan. 118, 121, 105 P.3d 1247 (2005) (quoting *State v. Cox*, 258 Kan. 557, Syl. ¶ 7, 908 P.2d 603 [1995]).

## STATUTORY IMPLICATIONS

The Insurance Company points out that the 1994 amendments to K.S.A. 40-2,118 were specifically applied to all claims made under any insurance policy. K.S.A. 40-2,118(d). Therefore, the Insurance Company contends the legislative intent was to relieve an insurer of the obligation to perform under a union mortgage clause if the named insured commits a fraudulent insurance act. It relies on the subsection (c) declaration that "[an] insurer shall not be

required to provide coverage or pay any claim involving a fraudulent insurance act." K.S.A. 40-2,118(c).

A plain and common sense reading of the statute indicates an intent to simply relieve an insurer from any obligation, separate and apart from the terms of the insurance policy contract, to provide coverage or pay any claim involving a fraudulent insurance act. We do not read the statutory language as voiding coverage which an insurer chooses to voluntarily offer for the benefit of the insured. To find that the legislature intended to absolutely prohibit union mortgage clauses in this state, one must ignore the words, "be required to," and read the statutory language to mean an "insurer shall not provide coverage or pay any claim involving a fraudulent insurance act." The legislature is presumed to express its intent by the language that it employs and, therefore, we do not cavalierly delete words from statutes. See *State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85 (2006). Giving ordinary meaning to the ordinary words of the statute, K.S.A. 40-2,118(c) does not abolish all standard or union mortgage clauses.

The Insurance Company propounds a number of arguments in support of its statutory argument. We will attempt to address them separately.

*Legislative History*

The Insurance Company urges us to find that the timing of the 1994 amendments indicates a legislative intent to overrule the holding in *Union State Bank v. St. Paul Fire & Marine Ins. Co.*, 18 Kan. App. 2d 466, 471, 856 P.2d 174, *rev. denied* 253 Kan. 864 (1993), and thus to abolish the "union mortgage doctrine" in this state. The argument invites us to speculate as to the legislature's reason for amending K.S.A. 40-2,118. We perceive that the statutory language precludes the need for us to guess about the legislature's motivation. See *Board of Leavenworth County Comm'rs v. Whitson*, 281 Kan. 678, 685, 132 P.3d 920 (2006) (resort to legislative history or statutory construction rules to ascertain legislative intent is appropriate only when a plain reading of the text of the statute yields an ambiguity or lack of clarity). Nevertheless, the legislative history suggests the proponents of the amendments were

principally concerned with specifying criminal penalties and restitution within the insurance code to deter insurance fraud, rather than clarifying insurance policy coverage issues.

*Case Precedent*

The Insurance Company's arguments are founded upon its creative, albeit faulty and unpersuasive, reading and application of case precedent. For instance, the Insurance Company believes that the district court misread the holding in *Voyles v. Garcia*, 28 Kan. App. 2d 462, 17 P.3d 947, *rev. denied* 271 Kan. 1042 (2001), to incorrectly find that the purpose of the 1994 amendments was to correct the result in *Continental Western Ins. Co. v. Clay*, 248 Kan. 889, 896, 811 P.2d 1202 (1991). *Continental Western*, 248 Kan. at 896, found that the Kansas Automobile Injury Reparations Act did not permit an insurance company to rescind the mandatory liability provisions of an automobile policy, even though the company could rescind the nonliability features of the policy.

In *Voyles*, the successful plaintiff in a tort action attempted to collect the judgment from the tortfeasor's automobile insurer. However, the tortfeasor's insurer had rescinded the policy, with a corresponding rescission of the tortfeasor's liability coverage, due to the insured's fraud. *Voyles* reviewed the Act in light of its 1994 amendments and found that the plain language of K.S.A. 40-2,118 showed that the legislature intended the Act to apply to all insurance policies. Therefore, an insurance company could rescind its policy, even as to innocent third-party claims, upon proof that the policy was procured by a fraudulent insurance act. 28 Kan. App. 2d at 465-66. In reaching its decision, *Voyles* referred to the prior decision in *Continental Western*.

The Insurance Company contends that the 1994 amendments could not have been a delayed response to the 1991 holding in *Continental Western*, but rather the legislature must have acted to rectify the *Union State Bank* decision which was closer in time. We need not ruminate on the speed with which the legislature reacted to appellate decisions some decade and a half ago. The Insurance Company's argument flounders for at least two reasons.

First, *Continental Western* and *Voyles* both involved third-party claimants who attempted to obtain loss payments from another person's rescinded insurance policy based upon alleged rights the third-party accrued from a source outside of the policy. The third-party claims were in derogation of the plain policy language voiding coverage for the insured's fraudulent acts. Regardless of the impetus for the 1994 amendments, the language of K.S.A. 40-2,118(c) plainly says that the insurer is not required to pay such a claim.

In contrast, the Bank is specifically named in the insurance policy as a "mortgagee holder." The policy specifically grants a mortgageholder "the right to receive loss payment," even if the insured's claim is denied because of the insured's acts. The Bank is making a claim based upon its rights under the insurance contract, not based upon some third-party beneficiary right. *Voyles* and *Continental Western* are not germane to the validity of a named mortgageholder's contract claim.

Second, the Insurance Company's reliance on the timing of the *Union State Bank* decision is misdirected. The holding in that case does not support the argument. *Union State Bank* had absolutely no impact on the long-standing recognition and application of a union mortgage clause to the holder of a *real estate mortgage*. The issue in that case was whether a lender with a lien on dental office equipment could bootstrap its claim into the provisions of the union mortgage clause. The well-settled policy contract rights of the real estate mortgagee went unchallenged in *Union State Bank*, and there was nothing new for the legislature to fix in that regard.

*Restitution Provisions*

Next, the Insurance Company argues that the restitution provision of 40-2,118(c) manifests a legislative intent to replace a mortgagee's contract rights under the union mortgage clause with a right of restitution against its borrower, the fraudulent actor. The argument cannot withstand scrutiny.

The Bank's principal risk of financial loss is the nonpayment of the Named Insured's debt to the Bank. The Bank does not need a right of restitution under K.S.A. 40-2,118(c) to collect the remaining debt balance and damages from the Named Insured; that

right already exists under the notes and mortgages the Named Insured executed in favor of the Bank. In other words, the purported consideration flowing to the lender is illusory. Accordingly, contrary to the Insurance Company's argument, there is no real quid pro quo in the statute that justifies extinguishing a lender's insurance policy contract rights under the union mortgage clause.

Perhaps more importantly, the language employed by the legislature contradicts the Insurance Company's argument. K.S.A. 40-2,118(c) speaks to an order of restitution as an additional penalty for violating the statute. The provision is preceded by a subsection establishing the severity level for the *crime* of committing a fraudulent insurance act. The restitution provision is obviously intended to be a part of the criminal sanction imposed upon a violator. *Cf.* K.S.A. 2006 Supp. 21-4603d(b) (providing for restitution as an authorized disposition when a person has been found guilty of a crime). There is nothing to suggest that the statutory criminal penalty was intended to supplant the civil remedies of a breach of contract claimant.

### Public Policy

The Insurance Company contends that we should judicially craft public policy by interpreting K.S.A. 40-2,118 to void union mortgage clauses. Our first constraint, of course, is the separation of powers. We are to " 'give effect to the intention of the legislature as expressed rather than determine what the law should or should not be.' " *Pieren-Abbott*, 279 Kan. at 88 (quoting *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 [2003]).

Even if we were to be guided by a desire to effect public policy, we would reject the Insurance Company's concept of the policy considerations involved here.

The contention that "banks have been allowed to profit from the criminal conversion of insured property into insurance proceeds" is unsupported by the facts of this case and misleading. No evidence was adduced to indicate that the Bank had knowledge of or participated in the Named Insured's fraud upon the insurance company. Further, one gets the impression that the Insurance Company believes that, as between two innocent entities, one that

sold fire insurance to an arsonist and one that lent money to an arsonist, the equities favor the insurer. We are unconvinced that public policy mandates such a preference.

Here, the Bank contracted to lend money to the Named Insured in return for the security of a real estate mortgage which provided, *inter alia*, that the Named Insured's fire insurance would pay off the mortgage regardless of the borrower's acts. The Insurance Company issued a policy to the Named Insured which, on its face, complied with the terms of the mortgage. Public policy does not favor our usurping legislative power by crafting a strained statutory interpretation in order to excuse an insurer's payment to a mortgagee under a union mortgage clause.

In addition, the Insurance Company makes an impassioned plea for us to prevent future acts of arson by preventing insureds from profiting from their own crimes. It suggests that insurance companies will have little incentive to investigate and prove arson without the carrot of avoiding payments under a union mortgage clause. When placed under the light of the actual facts, the arguments are disingenous.

Here, the limit of liability on the Named Insured's building was $79,500. The judgment in favor of the Bank for the unpaid notes was just under $44,000. Through its efforts establishing arson, the Insurance Company avoided paying the $35,500 difference to the Named Insureds. In addition, by paying the Bank, the Insurance Company would become entitled to an assignment of the notes and mortgages. The Insurance Company had ample motivation to litigate its insured's fraudulent acts, separate and apart from the union mortgage clause question.

Meanwhile, by submitting a fraudulent fire insurance claim, the Named Insured became subject to prosecution for a felony; lost the insurance proceeds in excess of the mortgagee's claim; still owes the unpaid debt on the mortgage notes, albeit the debt is now payable to the Insurance Company; the business property is still encumbered by the mortgage; and the Named Insured is liable for other expenses arising out of the fraudulent act, such as clean-up costs. One would be hard-pressed to characterize that scenario as profiting from one's own crime.

*Article 9 of the Uniform Commercial Code*

For the first time on appeal, the Insurance Company argues that interpreting K.S.A. 40-2,118 to void union mortgage clauses is consistent with Article 9 of the Uniform Commercial Code. Specifically, it argues that insurance proceeds are one form of proceeds of collateral which cannot be treated as the unique property of any one creditor. However, it cites to K.S.A. 84-9-306 (Furse 1996), which has been repealed and the proferred language does not appear in the current version. See K.S.A. 2006 Supp. 84-9-315. Further, it argues that under K.S.A. 2006 Supp. 84-9-203(b)(2), a secured lender has no rights in collateral if the debtor has no legal rights in the property.

Generally, parties may not raise a new legal theory for the first time on appeal. *Cole v. Mayans*, 276 Kan. 866, 873, 80 P.3d 384 (2003). However, there are several exceptions to the general rule including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or assignment of a wrong reason for its decision. 276 Kan. at 873.

The Insurance Company provides no reason justifying consideration of its new theory. More importantly, it has failed to establish that Article 9 is applicable here. *Cf.* K.S.A. 2006 Supp. 84-9-109(d)(11) (excluding creation or transfer of an interest or lien on real property from provisions of Article 9). K.S.A. 40-2,118 deals specifically with fraudulent insurance acts; it was not intended to be driven by the law governing secured transactions.

## CONTRACT INTERPRETATION

Alternatively, the Insurance Company argues that the insurance policy, as endorsed, plainly and unambiguously excludes all obligation for it to pay anyone in the event the insured property is intentionally and criminally destroyed by the Named Insured. The Insurance Company presents two sub-issues, arguing that the policy language cannot be read to require payment to the Bank, and

then contending that the policy language does not create a "union mortgage clause."

The Insurance Company points to the policy language of various other sections of the insurance policy, including that which voids the policy in the event of fraud by the Named Insured and that which excludes payment for losses caused by the Named Insured's dishonest or criminal acts. Although the policy does not cross-reference the other provisions to the specific condition applicable to mortgageholders, the Insurance Company nevertheless attempts to establish an interface of the provisions to avoid paying the mortgagee.

The Building and Personal Property Coverage Form contains a section F, entitled "Additional Conditions," which makes those conditions apply "in addition to the Common Policy Conditions and the Commercial Property Conditions." The second condition listed is specifically entitled "Mortgageholders." Subsection (d) under that condition plainly explains to the reader that "[i]f we [the Insurance Company] deny your [the Named Insured's] claim because of your [the Named Insured's] acts or because you [the Named Insured] have failed to comply with the terms of this Coverage Part, the mortgageholder [the Bank] will still have the right to receive loss payment . . . ."

It is difficult to perceive how a provision could be more clear in telling a named insured and the listed mortgageholder that the mortgagee gets paid, even if the insured commits arson. The Insurance Company suggests that one should be able to ascertain, by jumping back and forth among other policy provisions, that "your acts" was not intended to mean fraudulent insurance acts. To do so, one must strain to interpret the other provisions as modifying, restricting, or deleting the plain language in the additional condition specifically applicable to mortgageholders. That exercise does not pass the test for policy language interpretation, *i.e.*, what a reasonably prudent insured would understand and not what the insurer intended.

Likewise, the Insurance Company's argument that a "Kansas Changes" endorsement contradicted the main policy's mortgageholder coverage fails to pass muster under the reasonably prudent

insured test. The district court found that the endorsement made no readily apparent change to the provision contained in the original policy. Viewing the original and the endorsement language side-by-side corroborates the district court's assessment:

Endorsement entitled: **"KANSAS CHANGES— CONCEALMENT, MISREPRESENTATION OR FRAUD"**

The original provision, contained in a section entitled, **"COMMERCIAL PROPERTY CONDITIONS"** reads as follows:

"The **CONCEALMENT, MISREPRESENTATION OR FRAUD Condition** is replaced by the following:

**"CONCEALMENT, MISREPRESENTATION OR FRAUD**

"We will not pay for any loss or damage in any case of:

    "1. Concealment or misrepresentation of a material fact; or
    "2. Fraud; committed by an insured at any time and relating to an insurance application, rating, claim or coverage under this policy."

"A. **CONCEALMENT, MISREPRESENTATION OR FRAUD**

"This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part."

The Insurance Company principally argues that, by using the language of K.S.A. 40-2,118, the endorsement was obviously in-

tended to negate the coverage extended to the mortgageholder in the original policy. First, we have determined that the statute does not invalidate union mortgage clauses. Accordingly, an oblique reference to the statute via comparable endorsement language does nothing to support the Insurance Company's position.

Further, standing alone, the endorsement cannot reasonably be construed as abolishing any part of the mortgageholder condition. As the district court noted, the change intended by the endorsement is so subtle as to be nearly indistinguishable from the original. To say that an insured should realize the endorsement directly contradicts and invalidates the union mortgage clause is to flirt with frivolity.

Similarly, the Insurance Company's contention that its mortgageholder provision is a loss payee clause, rather than a union mortgage clause, is unsupportable by the contract language. The insurer wants to characterize the Bank as a loss payee because it contends that a loss payee derives its rights through the insured, *i.e.*, a denial of the insured's claim effects a denial of the loss payee's claim. Yet, the specific topic of subsection (d) is to describe what happens if the insured's claim is denied, which is the antithesis of a loss payable clause. If the Insurance Company intended a mortgagee to be a loss payee, the simple way to have done so was to omit subsection (d), the union mortgage clause, from the policy.

The Insurance Company attempts to rationalize the inclusion of the union mortgage clause in its policy, while arguing that it is not applicable, by explaining that it obtains its policy forms from a service that provides preapproved, standardized forms. As counsel conceded at oral argument, the inclusion of subsection (d) in the standardized form indicates that the industry norm, nationwide, is to provide a union mortgage clause. That concession certainly tempers the Insurance Company's argument that union mortgage clauses are obsolete and bolsters the Bank's arguments that it legitimately relied upon the plain policy language as providing the standard mortgage clause required by its mortgage. Nevertheless, if the Insurance Company proposed to deviate from the standardized coverage, it was incumbent upon the insurer to clearly state

the deviation in a manner that a reasonably prudent insured could understand. It did not do so here.

Finally, the Insurance Company's attempt to distinguish the policy language involved in the *Union State Bank v. St. Paul Fire & Marine Ins. Co.*, 18 Kan. App. 2d 466, 856 P.2d 174, *rev. denied* 253 Kan. 864 (1993), case is ineffectual. There, the mortgage holder clause, which was given effect with respect to the real estate mortgagee, provided: "If we deny your claim because of your acts or because you haven't complied with the terms of this agreement, the mortgage holder will still have the right to receive loss payments." *Union State Bank*, 18 Kan. App. 2d at 468. That language is nearly identical to the words contained in the policy now before us.

## SUMMARY

The legislature did not intend for K.S.A. 40-2,118(c) to nullify or invalidate all standard or union mortgage clauses or to preclude an insurer from voluntarily providing coverage under a standard or union mortgage clause. The legislation simply clarifies that an insurer is not required to provide coverage for or make payments to a claimant where the named insured commits a fraudulent insurance act, unless the insurer has voluntarily provided such coverage under the insurance policy. A standard or union mortgage clause does not violate public policy.

The plain and unambiguous language of the Insurance Company's policy provided for loss payments to the Bank, notwithstanding a denial of the Named Insured's claim based upon the Named Insured's act, even if that act was a fraudulent insurance act under K.S.A. 40-2,118, *et seq.* The Insurance Company's policy contained a standard or union mortgage clause. No other provision of the policy or endorsement to the policy could be understood by a reasonably prudent insured as modifying, restricting, or abolishing the standard or union mortgage clause.

The district court's grant of summary judgment in favor of the Bank was appropriate. The judgment against the Insurance Company in favor of the Bank is affirmed.

Affirmed.

NUSS and LUCKERT, JJ., not participating.

LARSON, S.J., and RULON, C.J., assigned.