(177 P.3d 1284)
No. 97,452

EXCHANGE STATE BANK, ST. PAUL, KANSAS, *Appellant*, v.
THE KANSAS BANKERS SURETY COMPANY, *Appellee*.

Opinion filed March 14, 2008.

*Richard D. Loffswold, Jr.*, of Girard, for appellant.

*Ann L. Hoover*, of Topeka, for appellee.

Before MARQUARDT, P.J., LEBEN, J., and KNUDSON, S.J.

LEBEN, J.: Exchange State Bank of St. Paul, Kansas, bought a "check kiting fraud indemnification policy" from Kansas Bankers Surety Company. Exchange Bank certainly suffered a substantial loss from check-kiting, and it seeks to recover on the policy. We must decide whether its loss was covered under the policy's terms. The policy's key provisions will focus our consideration.

The first sentence of the policy said that it was "intended to protect the Insured from loss sustained because of the classic check kiting fraud." In a classic check-kiting scheme, a bank customer uses two or more checking accounts to take advantage of the practice of most banks to allow immediate funds access, thus allowing "uncollected funds" to be used. Uncollected funds are not yet transferred between banks to reflect the deposited check. A check-kiting scheme might involve the establishment of an account with Bank Aspera with a $500 deposit. The customer then writes a check from Bank Aspera for $50,000 and uses that check to open an

account with Bank Buffalo. The customer then deposits a check from Bank Buffalo to Bank Aspera for $50,000. If these banks allow regular customers to write checks against uncollected funds, the check-kiting scheme takes advantage of the time it takes to process checks in the check-collection system. The check-kiting customer continues to make regular deposits from each account to the other unless or until the scheme is discovered. At that point, the "kite" collapses, and one of the banks is stuck with the loss. Exchange Bank sought to insure against that potential loss.

Section II of the policy is the "Insuring Agreement"; it provides a definition of check-kiting for purposes of the policy. That definition appears to track fairly well with the common understanding of check-kiting. It covers the "constant systematic back and forth deposit of funds between . . . two or more accounts utilizing checks of approximately the same amount to create the appearance of valid funds in the account" involving "deposits with the Insured drawn against uncollected funds deposited in another institution to create the appearance of valid funds in the account at the other institution," so long as "the Insured is, in fact, deceived by such deposits."

Section VIII contains exclusions from coverage; it excludes coverage "for any loss which is the result of the *willful extension of credit by the Insured* through the payment of checks drawn on uncollected funds." (Emphasis added.) Specific provisions in a contract control over general ones, *Colburn v. Parker & Parsley Dev. Co.*, 17 Kan. App. 2d 638, 649, 842 P.2d 321 (1992), and genuine ambiguities in an insurance contract are resolved against the insurance company. *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 281 Kan. 844, 858, 137 P.3d 486 (2006). Our primary task in this case is to determine whether Exchange Bank's losses resulted from "the willful extension of credit" so as to be excluded from insurance coverage.

We conclude that Exchange Bank did make a willful extension of credit in this case. The bank's customer, Cash Grain of Weir, Inc., had checking accounts at both Exchange Bank and at Labette Bank in Cherokee, Kansas. The kite in this case collapsed in August 2004. Before then, Cash Grain was regularly listed on Exchange

Bank's internal overdraft reports. Whenever that occurred, personnel at Exchange Bank called Cash Grain to request new deposits to cover the amounts. When checks were deposited from Cash Grain's Labette Bank account, Exchange Bank approved the specific use of uncollected funds by Cash Grain. In these circumstances, there was a willful extension of credit, and the policy does not provide coverage for Exchange Bank's losses.

## *The District Court's Decision*

The district court found that the exclusion from coverage applied and granted summary judgment to Kansas Bankers Surety Company. The district court concluded that Exchange Bank willfully extended credit simply by allowing its customer, Cash Grain, to draw against uncollected funds:

"Plaintiff argues that by paying checks of Cash Grain of Weir, Inc. when there were insufficient collected funds in Cash Grain of Weir, Inc.'s account to cover the checks, that plaintiff did not *extend credit* to Cash Grain of Weir, Inc. Webster's Collegiate Dictionary (10th ed.) defines 'credit' as 'an amount or sum placed at a person's disposal by a bank.' By paying checks written by Cash Grain of Weir, Inc.[] on its account with plaintiff when Cash Grain of Weir, Inc. did not have sufficient collected funds in its account to cover the checks written, plaintiff was placing its own funds at the disposal of Cash Grain of Weir, Inc. until the checks deposited by Cash Grain of Weir, Inc. were collected. Simply put, plaintiff extended credit to Cash Grain of Weir, Inc. by payment of checks on uncollected funds.

"Did plaintiff 'willfully' extend credit to Cash Grain of Weir, Inc. through payment of checks drawn on uncollected funds on or about August 9th, 2004?

"The act of depositing a check in a bank requires that the depositary bank present that check to the bank upon which it was drawn for payment of the funds represented by the check. Until paid by the bank upon which it was drawn, the check represents 'uncollected funds.' A bank is under no obligation to extend credit on such 'uncollected funds' other than as mandated by State or Federal law. . . .

"The Expedited Funds Availability Act of 1987 (12 U.S.C. 4001 et seq.) does set forth time limits for fund availability. Proceeds from checks drawn or payable to a bank located in the same check processing region as the depository bank (as is the case for the Cash Grain of Weir, Inc. checks in question) must be available at the start of the second business day after deposit; however, deposits over a $5000 aggregate on any banking day are not subject to this time limit. Thus, the court finds that plaintiff was not legally obligated to make funds available to Cash Grain of Weir, Inc. for the checks of Cash Grain of Weir, Inc. that were deposited

in August of 2004 until those funds had been collected from the drawee bank; rather, plaintiff made a conscious decision to extend credit on those deposited checks to Cash Grain of Weir, Inc.

"For the reasons set forth, the court finds that the uncontested facts establish that plaintiff extended credit to Cash Grain of Weir, Inc. for checks it deposited in August of 2004 and it was this extension of credit that caused plaintiff's loss. The court further finds that under the uncontested facts, such extension of credit was willful."

Under the district court's interpretation of the insurance policy, the policy would provide very little coverage for check-kiting. Regulation CC, adopted pursuant to the Expedited Funds Availability Act of 1987, 12 U.S.C. §§ 4001 (2000) *et seq.*, "mandates early funds availability as a matter of federal policy." 1 Clark & Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 9.04 (Rev. ed. 2007). The district court noted that there is an exception to the requirement for expedited funds availability when the aggregate deposits in a day exceed $5,000, see 12 C.F.R. 229.13(b), which was usually the case here. But even then, the requirements of expedited funds availability apply to the first $5,000 of deposits each day. Clark & Clark, ¶ 7.11[5]. In any case, whether required or merely permitted by law, most banks routinely allow customers to draw against uncollected funds, and the classic check-kiting scheme is premised on this fact. We believe that the district court has interpreted the policy too narrowly, but the undisputed facts of our case establish that Exchange Bank did more than routinely allow its customer to draw against uncollected funds—it made a willful decision here that amounted to an extension of credit.

*The Uncontested Facts Show That Exchange Bank Made Conscious Decisions to Allow Cash Grain to Use Uncollected Funds.*

The case was submitted to the district court on cross-motions for summary judgment. Most of the facts were undisputed.

The president of Exchange Bank directed the handling of Cash Grain's account from at least sometime in 2003 until the check-kiting was discovered in August 2004. The bank's practice with respect to insufficient-funds checks from Cash Grain was the same throughout this time period, even though the person acting as bank president changed. The bank president directed that when Cash

Grain was listed on the bank's internal insufficient-funds-check list, a bank employee would call Cash Grain "and tell them to make a deposit and it was [the president's] decision to pay the checks in the red and charge a fee or return them." The bank president authorized paying the checks on many occasions. During the time period from June 3, 2004, through August 12, 2004, the bank charged $2,860 in insufficient-fund-check charges to Cash Grain.

Exchange Bank's vice president, Robert Schoenhofer, told Kansas Bankers Surety "that when a check was returned to the Bank for insufficient funds, an insufficient fund fee (NSF) was charged by the Bank when the decision was made by the Bank to manually/force pay the check, when there were insufficient funds in the account of the customer to cover the check." It was "the practice of the bank . . . to call Cash Grain of Weir and advise the company how much of a deposit would need to be made for checks on the NSF Report to clear." Schoenhofer said that checks were paid on the account when there were no collected funds in the account; a fee was charged Cash Grain of Weir when these checks "were manually/force paid."

During the time period from 2002 through August 2004, Cash Grain's account appeared on the overdraft report "almost continuously for four years, in escalating amounts." The company appeared on the bank's report of insufficient-funds checks "on a daily basis for a period of time preceding the August 2004 claim." The high for overdrafts reached $404,225 on July 9, 2004. On that date, there was a notation reflecting the practice of the bank of calling Cash Grain for deposits to cover overdrafts: "needs 333,565.27." Bank records showed uncollected funds reached a high of $66,578 in 2002, $165,974 in 2003, and $373,575 in July 2004. Uncollected funds on the Cash Grain account were in excess of $300,000 six times in July and three times in August 2004.

The string ran out on Cash Grain's check-kiting operation in August 2004. On August 9, 2004, Cash Grain deposited three checks totaling $408,000, all drawn on its Labette Bank account, into the Exchange Bank account. On August 10, 2004, Cash Grain deposited another check for $115,000 drawn on its Labette Bank account into the Exchange Bank account. On August 11, 2004,

$410,000 of checks drawn on the Labette Bank account and previously deposited into the Exchange Bank account were returned for insufficient funds. On August 12, 2004, another check for $98,000 was returned for insufficient funds. On August 13, 2004, the three checks for $408,000 deposited on August 9 were returned for insufficient funds, and the check for $115,000 deposited on August 10 was returned for insufficient funds on August 14, 2004.

Kansas Bankers Surety Company issued a check-kiting indemnification policy for the time period of this loss. The policy limit of $250,000 was exceeded by the bank's losses, so if there is coverage, the bank would recover $250,000.

*We Review the Grant of Summary Judgment De Novo When There Are No Significant Disputed Facts and Interpretation of a Contract Is the Central Issue.*

The district court granted summary judgment to Kansas Bankers Surety. The standards for granting summary judgment are well known and need not be extensively reviewed here. The basic facts in this case were undisputed. We must determine whether one party is entitled to judgment based upon these undisputed facts. See *City of Arkansas City v. Bruton*, 284 Kan. 815, 834, 166 P.3d 992 (2007). In order to make that determination, we must interpret the insurance policy issued by Kansas Bankers Surety. The policy is a written contract that is just as easily interpreted by us as by the district court. In interpreting that contract and applying it to the undisputed facts of this case, we therefore exercise de novo review, which means that we look at the matter anew, without any required level of deference to the conclusions reached by the district court. *Iron Horse Auto, Inc. v. Lititz Mut. Ins.*, 283 Kan. 834, 838-39, 156 P.3d 1221 (2007).

*The Loss Here Is Within the Coverage Exclusion for Willful Extensions of Credit.*

There are competing notions at play in interpreting this insurance policy. On the one hand, its plain language provides an exclusion for the willful extension of credit. The district court found that any time a bank knowingly allows its checking-account customers to draw against uncollected funds, the bank is extending

credit to the customer. That conclusion is supported by common sense, as the leading treatise on bank deposits and collections recognizes: "In a very real sense, a kite involves a series of loans. The decision to allow a customer to draw against uncollected funds is basically a credit decision." 1 Clark & Clark, ¶ 9.04.

But a conclusion that *any* allowance of withdrawal of uncollected funds is a loan for legal purposes would seem unwise as a matter of public policy: loans are carefully regulated, the Expedited Funds Availability Act and Regulation CC both encourage and sometimes mandate quicker availability of deposits, and returned checks represent a very small percentage (less than 1%) of deposited items. Thus, the Clark treatise concludes generally that "[a]llowing draws on uncollected funds should not be considered an extension of credit for any number of purposes." 1 Clark & Clark, ¶ 9.08; see also *Laws v. United Missouri Bank of Kansas City N.A.*, 98 F.3d 1047, 1050-51 (8th Cir. 1996) (routine advances against uncollected funds are not a loan and do not constitute a debt to the bank for bankruptcy preference purposes).

More importantly, interpreting this insurance contract in the manner the district court did would run counter to an important requirement of contract interpretation: the insurance contract must be interpreted to *cover something* or much of it would be rendered meaningless. See *LDF Food Group, Inc. v. Liberty Mut. Fire Ins. Co.*, 36 Kan. App. 2d 853, 863, 146 P.3d 1088 (2006); Jerry & Richmond, *Understanding Insurance Law* § 25A at 153-54, 155-56 (4th ed. 2007). All check-kiting involves the withdrawal of uncollected funds. If one concludes that any bank willfully extends credit merely by deciding generally to allow customers to draw against uncollected funds, then the insurance policy for which Exchange Bank paid a premium would become worthless.

"Willful" generally means a "voluntary and intentional" act, Black's Law Dictionary 1630 (8th ed. 2004), something done knowingly and purposefully. *State v. Coyote*, 268 Kan. 726, 734, 1 P.3d 836 (2000); see also American Heritage Dictionary 1968 (4th ed. 2006) (defining "willful" as "said or done on purpose; deliberate"). Thus, a willful extension of credit necessarily involves some conscious decision to lend money and take on some credit risk. The

normal banking practice of allowing expedited funds availability is not done for the purpose of extending credit. It is done to accommodate the needs of customers, to comply with federal policy on availability of funds, and to expedite check processing given the relatively small percentage of returned checks. The mere practice of allowing bank customers generally to use uncollected funds would not constitute the willful extension of credit under the policy.

But the case before us involves much more knowing and purposeful action on behalf of Exchange Bank. Exchange Bank made conscious decisions to pay checks against uncollected funds over a period of months, charged overdraft fees, manually forced payment of the overdrafts, and routinely called the customer to get additional checks for deposit to cover the overdrafts. The Clark treatise on bank deposits and collections has a detailed discussion of when the use of uncollected funds should be considered a loan. The conclusion of its authors strongly suggests that the situation we have before us is all the way toward the loan end of the spectrum of possibilities:

"To what extent should payment transactions on the deposit side qualify as 'loans' for purposes of limits on extension of credit to a single borrower, or for other purposes? This issue arises frequently in banking cases. *Some cases seem easy. Making a conscious decision to allow a hard overdraft in a checking account should qualify as an unsecured 'loan,' even if the depositor has not signed a formal overdraft credit agreement.* However, . . . [w]hat about allowing a depositor to draw on uncollected funds in a checking account? Should that amount be considered a 'loan' for lending limit purposes, or other purposes?

"In the past, federal regulations on these issues were not always consistent. However, the [regulations were amended in 1995] . . . to make it clear that neither daylight overdrafts nor payment against uncollected funds are 'loans.' " (Emphasis added.) Clark & Clark, ¶ 9.08.

In our case, the parties agreed that Exchange Bank "manually/force paid" checks written on Cash Grain's account, and that this was done after conscious decision-making, not pursuant to some standard policy or computer programming for handling routine check payments. We believe the authors' conclusion is on the mark in the context of the insurance policy at issue here. Exchange Bank will-

fully extended credit to Cash Grain when it allowed the withdrawal of uncollected funds in August 2004.

The parties have not cited—and we have not found—any cases discussing whether the use of uncollected funds constituted the willful extension of credit under an insurance policy. Accordingly, the cases cited here by the parties only provide general guidance for the issue we face. Exchange Bank cites several cases holding that the obligation to reimburse a bank for money is not a loan when the funds were obtained through the use of uncollected funds withdrawn after the deposit of worthless checks. *E.g., First National Bank of Decatur v. Insurance Co. of No. Am.*, 424 F.2d 312, 316 (7th Cir. 1970), *cert. denied* 398 U.S. 939 (1970); *NCNB Nat. Bank of Florida v. Aetna Cas. & Sur. Co.* 477 So. 2d 579, 583 (Fla. App. 1985). Those cases are not particularly helpful, though, because the policy at issue here involves the willful extension of credit. The Kansas federal court indicated that something might "amount to" a loan even though it wasn't formally one in *Sec. Nat. Bank of Kansas City v. Continental Ins.*, 586 F. Supp. 139 (D. Kan. 1982). There were factual similarities to our case in that the bank made regular calls for additional deposits and then manually approved the payment of overdrafts. An exclusion in the banker's blanket bond excluded coverage not only for loans but also for any " 'transaction in the nature of or amounting to a loan.' " 586 F. Supp. at 150. The court noted that the "credit advances" given to the customer were prearranged and approved by bank officers, and said it was "generally impressed" with the defendant's argument that this was covered by the exclusion, even though it ultimately chose to rest its decision on other policy provisions. 586 F. Supp. at 151.

Exchange Bank makes one additional argument that we must address. It contends that the exclusions of Section VIII of the policy do not apply at all unless a third party has made a claim against the insured. Section VIII contains seven separate exclusions preceded by this introduction: "The Underwriter shall not be liable to make any payment or provide any defense in connection with any claim made against the insured." Exchange Bank contends that the phrase "in connection with any claim made against the insured"

applies both to the action before the word "or" and to the action after the word "or." In other words, under Exchange Bank's interpretation, there are no exclusions to the policy unless payment is being made under the policy "in connection with any claim made *against* the insured," which would be a third-party claim.

Exchange Bank's interpretation does not make sense. The introduction to Section VIII relates to the remainder of the policy. The first action ("to make any payment") refers to Section II of the policy, which provides coverage "for direct loss sustained" from checks paid because of check-kiting fraud. The second action ("[to] provide any defense") refers to Section VII of the policy, which provides coverage for attorney fees and costs of "defending any suit or legal proceeding brought against the Insured to enforce liability . . . on account of" a covered loss. Words are known by the company they keep. It is significant then that reference to claims made against the insured immediately follows reference to the obligation to provide a defense. The obligation to provide a defense comes only via Section VII, which only applies in the event of a third-party claim. The obligation to make "any payment" under the policy logically comes via Section II, which is not related to whether a third party has made a claim.

It would not be reasonable here to conclude, as Exchange Bank contends, that there are *no* policy exclusions that apply unless a third party has made a claim. The essence of this policy is its coverage for check-kiting, a loss that arises irrespective of claims by third parties. Another exclusion is "for any indirect or consequential loss." A bank might well fail because of a large check-kiting loss, but surely no one would have intended that such consequential losses would be excluded only when third parties brought claims.

Exchange Bank did not lose funds in Cash Grain's check-kiting scheme based upon a routine practice of allowing its customers to have quick funds availability and thus draw on uncollected funds. Its loss was a result of its conscious decision to extend credit through continual overdrafts, paid only after bank officials made manual decisions to pay them. Accordingly, there is no coverage for the loss.

The judgment of the district court is affirmed.