No. 126,699

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JENNIFER HARDING and SAMANTHA RAMIREZ,
Individually and on Behalf of All Others Similarly Situated,
*Appellants*,

v.

CAPITOL FEDERAL SAVINGS BANK,
*Appellee*.

SYLLABUS BY THE COURT

1.

When evaluating whether a district court erred by granting a motion to dismiss for failure to state a claim, it presents an appellate court with a question of law subject to unlimited review.

2.

When a district court has granted a motion to dismiss for failure to state a claim, an appellate court must accept the facts alleged by the plaintiff as true, along with any inferences that can reasonably be drawn therefrom. The appellate court then decides whether those facts and inferences state a claim based on plaintiff's theory or any other possible theory. If so, the dismissal by the district court must be reversed.

3.

Whether the district court erred in its interpretation of a contract is a question of law over which an appellate court exercises unlimited review.

4.

When interpreting a contract, the primary rule is to interpret the contract as the contracting parties intended.

5.

For ambiguity to exist within a contract, the contract's provisions or language must have doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. A contract is ambiguous if after applying the rules of contractual construction, a court is genuinely uncertain which one of two or more meanings is the proper meaning. When a court determines that disputed contractual language is ambiguous, a court is required to strictly construe any ambiguous language against the drafter of the contract.

Appeal from Shawnee District Court; MERLIN G. WHEELER, judge. Oral argument held August 8, 2024. Opinion filed October 4, 2024. Reversed and remanded with directions.

*David G. Seeley* and *Lyndon W. Vix*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellants.

*Kersten L. Holzhueter* and *Bryant T. Lamer*, of Spencer Fane LLP, of Kansas City, Missouri, for appellee.

Before GREEN, P.J., HILL and GARDNER, JJ.

GREEN, J.: We are called on to determine whether the district court was correct in dismissing plaintiffs Jennifer Harding's and Samantha Ramirez' class action suit against Capitol Federal Savings Bank for failure to state a claim upon which relief can be granted. The decision we review was entered on a motion to dismiss. We therefore accept the facts alleged by the plaintiffs as true, along with any inferences that can reasonably be drawn therefrom. And then we ask whether those facts and inferences state a claim based

on plaintiffs' theory or any other possible theory. And if so, the dismissal by the district court must be reversed.

On appeal, plaintiffs assert that there are four issues before this court: (1) whether the district court correctly ruled that Capitol Federal's motion to dismiss should be granted based on plaintiffs' pleadings; (2) whether the district court wrongly considered information outside the scope of the parties' pleadings when it granted Capitol Federal's motion to dismiss; (3) whether the notice provision under Section G of the Account Agreement is unconscionable; and (4) whether the district court wrongly denied plaintiffs' motion to further amend their petition to address their compliance with Section G of the Account Agreement. Of these four issues, we find the principal issues presented for decision is whether the district court correctly ruled that Capitol Federal's motion to dismiss should be granted based under plaintiffs' pleadings for breach of contract. Also, we will consider whether the district court correctly considered information outside the scope of plaintiffs' breach of contract claims and breach of the covenant of good faith and fair dealing pleadings when it granted Capitol Federal's motion to dismiss.

Plaintiffs argue that the district court violated Kansas' longstanding precedent on reviewing motions to dismiss and interpreting language within a contract. Capitol Federal responds that the district court correctly granted its motion to dismiss because plaintiffs did not notify Capitol Federal about the disputed fee charges before suing it contrary to the bank's notice provision.

To sustain the district court's granting of Capitol Federal's motion to dismiss, this court would have to conclude that, under plaintiffs' pleadings, they could not produce any evidence justifying some form of relief. We are unable to say with certainty the untenability of plaintiffs' position. Thus, we reverse the district court's dismissal of plaintiffs' breaches of contract claims against Capitol Federal and remand to the district

3

court for further proceedings on their class action suit. Obviously, today we do not decide the merits of plaintiffs' class action suit. That decision must follow from a full factual development of the facts in the district court. We rule only that their breach of contract claims stated in their lawsuit should not have been dismissed on their pleadings as a matter of law.

BACKGROUND

Plaintiffs each had personal checking accounts with Capitol Federal. In mid-September 2022, Harding filed a class action against Capitol Federal under K.S.A. 2022 Supp. 60-223 for charging her a fee for a purchase that was authorized when she had a positive balance in her checking account. She asserted that this violated Capitol Federal's Disclosure and Agreement for Savings and Transaction Accounts (Account Agreement)—the contract controlling how she could use her Capitol Federal consumer checking account. In early October 2022, Ramirez joined Harding's lawsuit against Capitol Federal. Ramirez argued that Capitol Federal violated their Account Agreement by charging her a fee each time the merchant resubmitted Ramirez' debit card to settle a transaction.

Because the parties' arguments involve complex banking procedures in Capitol Federal's Account Agreement, however, before further addressing the underlying facts of plaintiffs' lawsuit against Capitol Federal, this court will review how those complex banking procedures work. And in short, it is essential to understanding the parties' arguments before the district court and on appeal. So, the ensuing background section of this opinion discusses how those complex banking procedures work before discussing the remaining factual history of plaintiffs' lawsuit against Capitol Federal in the district court.

*Disputed Banking Procedures*

Plaintiffs' breach of contract claims against Capitol Federal involve the bank's decision to impose fees on certain purchases that they attempted to pay with their debit cards associated with their Capitol Federal consumer checking accounts. Harding's claim asserts that Capitol Federal breached its Account Agreement by charging an overdraft fee on a transaction that was authorized on an account with positive funds to cover the transaction but was settled when the account had insufficient funds to cover the transaction. This type of overdraft fee is called an Authorize Positive Purportedly Settle Negative (APPSN) fee. See 58 No. 1 U.C.C. Law Letter NL 4. Typically, a bank imposes an APPSN fee when "a consumer had enough money in their account at the time the consumer used their debit card, but due to intervening transactions or withdrawal authorizations, the bank deemed the consumer's account to be zero or negative at the time the debit card transaction settled." 58 No. 1 U.C.C. Law Letter NL 4.

In *Feyen v. Spokane Teachers Credit Union*, 23 Wash. App. 2d 264, 273, 515 P.3d 996 (2022), *rev. granted* 1 Wash. 3d 1024 (2023), the Washington Court of Appeals used a helpful hypothetical that it labeled the "breakfast charges scenario" to explain how a bank may impose an APPSN fee:

> "[The breakfast charges scenario] explains the significance of the difference between the member's actual balance and available balance. According to this hypothetical, the member starts the day with an actual and available $10.00 balance. The member visits Starbucks and buys an $8.00 latte with her debit card. Her [bank's] available balance is now $2.00 and her actual balance is $10.00. The member next visits McDonald's for breakfast and purchases an Egg McMuffin for $2.79 and hash browns for $1.00, for a total of $3.79. Again, the member pays with her debit card. The member now still retains an actual balance of $10.00. But her available balance decreased to a negative $1.79. Assuming McDonald's settles its transaction first with [the bank], the member overdrafts. [The bank] assesses a $29.00 overdraft fee, and the member's available balance tumbles further to negative $30.79. . . . [A] day later, Starbucks settles its transaction. Because of

5

the negative balance, [the bank] charges another overdraft fee to the member. The member's available balance plummets to negative $67.79. Thus, the member pays two overdraft fees despite her account having sufficient funds to pay for the latte at the time of its purchase." 23 Wash. App. 2d at 273.

So, a bank imposes an APPSN fee on a consumer whose account's actual balance showed sufficient funds to pay for an item when the consumer paid for the item. Also, as stressed in the preceding scenario, if Starbucks had settled the consumer's coffee purchase with the bank first, then the bank could not have imposed an APPSN fee on the consumer for her coffee purchase. As a result, a merchant's discretionary decision when to settle the consumer's transaction with the bank also controls when a bank may impose an APPSN fee on a consumer.

Meanwhile, Ramirez' breach of contract claim challenges Capitol Federal's decision to impose multiple overdraft fees on a single item. This type of fee is called a non-sufficient funds (NSF) fee. 58 No. 1 U.C.C. Law Letter NL 4. Under Capitol Federal's Account Agreement, the bank may impose an NSF fee when a consumer's bank account lacks sufficient funds to pay for an item *and* the bank returns the consumer's transaction unpaid for sufficient funds. Yet, some banks have imposed multiple NSF fees on the same item bought by the consumer and presented for settlement by a merchant. If the merchant reattempts settling the consumer's transaction with the bank while the consumer's bank account still has insufficient funds, the bank will impose another NSF fee on the consumer. 58 No. 1 U.C.C. Law Letter NL 4. Thus, in such situations, a merchant's discretionary choice how many times to reattempt settling a consumer's outstanding payment with the bank determines how many NSF fees the bank imposes on the consumer.

*Proceedings Before the District Court*

In their amended petition, plaintiffs clarified why they filed a class action suit against Capitol Federal. Harding explained that she was suing Capitol Federal for breach of contract, including breaching the covenant of good faith and fair dealing, and for charging her a single $32 APPSN fee. Although it is unclear what Harding bought with her debit card, Harding argued that Capitol Federal should never have charged her the $32 APPSN fee because she had enough money in her bank account to pay for whatever she bought when the bank authorized the purchase.

As for Ramirez, she explained that she was suing Capitol Federal for breach of contract, including the covenant of good faith and fair dealing, and for charging her multiple NSF fees while attempting to pay her $164.87 AT&T bill. Ramirez explained that after she first tried to pay the AT&T bill, Capitol Federal returned her payment for insufficient funds and penalized her by charging her a $32 NSF fee. Later, when Capitol Federal tried reprocessing her payment two more times without her knowledge, it charged her two more NSF fees. As a result, Capitol Federal charged Ramirez a total of $96 in NSF fees for having insufficient funds to pay her $164.87 AT&T bill. Ramirez argued that Capitol Federal could not impose the multiple re-presentment NSF fees because nothing within the Account Agreement indicated that the bank had the authority to impose such fees.

Although plaintiffs never explicitly addressed Capitol Federal's Account Agreement's rules that a consumer must follow when notifying the bank about problematic charges to his or her bank account, they implicitly argued that the Account Agreement's notice provision did not apply in their case. Part IV, Section G of the Account Agreement stated that if the consumer's account statement "contains any errors or improper charges, [the consumer] agree[s] to notify [Capitol Federal] of any such errors or improper charges within 30 days of the date on which [Capitol Federal] mailed

7

or otherwise made the affected statement available to [the consumer]." It further stated that if a consumer failed to follow its notification procedures, that the consumer was "barred from bringing any action against [it] that is in any way related to the errors or improper charges." Regarding what transactions constituted "errors or improper charges," Section G discussed forged signatures, altered and unauthorized endorsements, as well as a merchant's failure to provide a purchased item to the consumer.

In their amended petition, plaintiffs emphasized that Capitol Federal's APPSN and NSF fee charges "were not errors." Rather, the APPSN and NSF fees "were part of the systematic and intentional assessment of fees according to [Capitol Federal's] standard practices." Based on this, plaintiffs argued that they had no duty to report to Capitol Federal the disputed APPSN and NSF fee charges that the bank intentionally imposed on them under Section G's procedures about reporting errant or improper charges. Then, they argued that because Capitol Federal was imposing the disputed fees, giving the bank notice of the disputed fees that it imposed would be "futile." Plaintiffs further alleged that they had "performed all of their obligations pursuant to Capitol Federal's agreements."

At the end of their amended petition, plaintiffs, on behalf of themselves and the classes of people charged APPSN fees and multiple re-presentment NSF fees, asked the district court for a jury trial on their claims against Capitol Federal. Plaintiffs also asked the district court to award them restitution for paying the "improper fees," any actual damages established, and any equitable remedies necessary.

Capitol Federal did not answer plaintiffs' petition or amended petition. Rather, Capitol Federal's first filing with the district court was a motion to dismiss plaintiffs' breach of contract claims under K.S.A. 60-212(b)(6). In its motion to dismiss, Capitol Federal primarily argued that the district court should dismiss plaintiffs' case because they failed to state a claim upon which relief could be granted by failing to follow the Account Agreement's notice provision in Section G. Capitol Federal asserted that because

plaintiffs argued that the bank could not legally charge them the APPSN and NSF fees, plaintiffs essentially asserted that the fees were improper. Capitol Federal then stressed that in plaintiffs' petition, plaintiffs referred to the disputed fees charged as "improper" twice. It contended that by doing this, plaintiffs admitted that the disputed fees constituted "improper charges" as meant under Section G's plain language. So, Capitol Federal concluded that plaintiffs' breach of contract claims against it were barred because they failed to notify the bank of the disputed fees, which they admitted were improper charges, within 30 days as explained in Section G. In the alternative, Capitol Federal argued that the district court should grant its motion to dismiss plaintiffs' case because the Account Agreement allowed it to assess APPSN fees on Harding and NSF fees on Ramirez.

After Capitol Federal moved to dismiss its case, plaintiffs responded by filing a detailed memorandum with the district court opposing each of the bank's arguments. In their response to Capitol Federal's arguments about them failing to follow Section G's notice provision, plaintiffs reasserted that the bank's intentional practice of charging APPSN fees and NSF fees meant that the fee charges at issue were not errant or improper charges under Section G. Plaintiffs pointed out that the Account Agreement does not expressly define the terms "'errors'" or "'improper charges.'" But Section G references forged signatures, altered endorsements, unauthorized endorsements, and a merchant's failure to deliver a paid item. Plaintiffs argued that this limited list of consumer transactions supported that Capitol Federal's intentionally imposed APPSN and NSF fees were not improper charges. In making this argument, plaintiffs broadly alleged that in Capitol Federal's motion to dismiss, the bank "attempt[ed] to introduce facts outside the pleadings." In their alternative argument, plaintiffs asserted that their ongoing dispute with Capitol Federal defining the improper charges established that the terms were ambiguous. For this reason, they concluded that at the very least, the district court should deny Capitol Federal's motion to dismiss because the ambiguity within Section G's notice provision meant that a question of fact still existed.

Eventually, the district court held a hearing on Capitol Federal's motion to dismiss plaintiffs' breach of contract claims against it under K.S.A. 60-212(b)(6). At the hearing, plaintiffs and Capitol Federal repeated their respective arguments. A large portion of the hearing concerned whether plaintiffs had to give Capitol Federal notice that they believed it wrongly imposed the APPSN and NSF fees on them. During that part of the hearing, the district court actively questioned plaintiffs' counsel about plaintiffs' notice provision arguments. This included questioning plaintiffs' counsel about whether plaintiffs ever attempted to contact Capitol Federal about the disputed APPSN and NSF fees before suing the bank for breach of contract.

At one point during the district court judge's questioning, the following exchange between the judge and plaintiffs' counsel occurred:

"THE COURT: . . . I have this nasty habit, at least some attorneys would call it a nasty habit, of being the devil's advocate on some things.

"But, when I reviewed the Amended Petition in this case, [counsel], I didn't find any allegation in the Petition of an attempt by the plaintiffs to even comply with the Notice Provision of the Account Agreement. Is there any such allegation in there?

"[COUNSEL]: No, Your Honor.

"THE COURT: So, as far as you know, nothing was done by the plaintiffs to raise an issue with the defendant before filing this suit; is that right?

"[COUNSEL]: I'm not aware of any. Our view is that because the Notice Provision doesn't refer to bank fees, that it wasn't applicable to the dispute.

"THE COURT: Okay. But if I determined that it is, you've got a real problem, don't you?

"[COUNSEL]: If you determine, Your Honor, that it is, we did not alert the bank within 30 days. Yes, that is correct.

"THE COURT: Okay. Isn't the contention in the petition here very simply that [Capitol Federal] made improper charges to the plaintiff[s'] accounts?

"[COUNSEL]: No, Your Honor. The contention is they charged bank fees in violation of their contract. The Notice Provision, Your Honor, never, in any respect, refers to bank fees.

10

"An improper charge refers to a purchase, a check, a deduction made by someone else. That is the most reasonable reading of the provision. These were not improper charges we're complaining about. Bank fees charged in violation of [a] contract which aren't covered by that Notice Provision, Your Honor.

"THE COURT: Is there any provision in this Account Agreement that would limit the phrase 'improper charges' to a charge made by the bank in these circumstance[s]?

"[COUNSEL]: Well, You Honor, the phrase 'improper charges' is not defined. So what is the most reasonable meaning of 'improper charges'? We think in the context in which it's found in the contract, it's referred to unauthorized surprise charges that account holders, that maybe fraud serviced on an account, or forged accounts.

"But, the fact that term 'improper charges' is undefined means, we think, that at the very least it's an ambiguous term. 'Improper charges' may very well mean what we say, or may possibly mean what the bank says. But the fact that there is such an ambiguity in that phrase 'improper charges' means you can't, Your Honor, respectfully dismiss based on that provision.

"THE COURT: Don't I initially determine ambiguity based on the language contained in the agreement?

"[COUNSEL]: Your Honor determines whether or not the agreement is ambiguous based on the language in the agreement. Yes, Your Honor.

"THE COURT: Can you point to any provision in this contract that specifically draws the distinction between an improper charge, and an intentional charge by [Capitol Federal]?

"[COUNSEL]: The distinction is when [Capitol Federal] refers to bank fees. It calls them fees, Your Honor. It doesn't call them charges. Some of the provisions I read earlier, 'You will be charged a fee,' not a charge. 'You will be charged a fee.'

"Bank fees are a separate animal. They're different from purchases. They're different from checks I write. Bank fees are something the bank imposes on accounts. Takes without asking, without sort of seeking permission. It just does it. It just takes the fees.

"They are a separate animal. They're referred to as fees, separate from charges throughout the agreement.

"The fact that the Notice Provision never once refers to fees, we think, is dispositive. To make a distinction between charges, that is purchases, things that—other

11

deductions from an account, cash withdraw[al]s. The distinction is made by the lack of the word 'fee' anywhere in that Notice Provision.

"THE COURT: Would you agree with me that generally speaking a Notice Provision has a condition precedent to file in the suit is generally upheld?

"[COUNSEL]: Your Honor, generally if the notice period is reasonable it's my understanding they are generally upheld.

"We would say here a 30-day notice provision to file suit, essentially imposing a 30-day, or one month limitations period on any contract dispute with the bank, would not be a reasonable limitations period.

. . . .

"We haven't briefed this really at all yet, but if the Court would like, we [could] submit some supplemental briefing on whether a 30-day limitations period is unconscionable under Kansas Law.

"It would essentially bar any contract dispute from ever being raised against the bank. It would be a very aggressive reading of the Notice Provision that is in, essentially, every bank contract in the country."

Ultimately, the district court judge granted Capitol Federal's motion to dismiss from the bench, providing the following explanation for his ruling:

"If I were ruling on this case solely on the merits of [plaintiffs' breach of contract claims], my ruling on a Motion to Dismiss would be to deny the Motion to Dismiss. Simply because I think that the allegations are sufficient to raise an issue as to whether or not the provisions of these accounts['] documents are sufficiently made that they should be interpreted by a Court.

"Now, however, we reached a point before we get to that point that these account documents contain a very clear Notice Provision that requires an account holder to give notice of any error or improper charge, and if they fail to do so within a defined period of time then they are precluded from bringing an action for breach of contract based upon that error, or improper charge. It's not a statute of limitation, it's simply a notice requirement.

"Now, I've often times been accused of being very literal in my use of the English language. But it strikes me here that the term 'improper charge' has to be viewed

12

from the perspective of the account holder. Because that term is—tells them that if you think there's something improper on your monthly statement you have to bring it to the attention of the bank before you're entitled to, at a later time, allege that the bank breached its obligations to you.

"And I appreciate the attempts on the part of the plaintiffs to distinguish an intentional charge to account from an improper charge. But as I think I've indicated to you, I think that's a distinction without a difference.

"And while I appreciate the effort to argue that that phrase is vague, I don't think it's vague in any way. The bottom line here is that the plaintiffs are alleging that there is an improper charge made to their accounts. And that charge is, I don't think, subject to any great deal of interpretation. The bank made a charge here. Even if I accept what is true.

"Now, under those circumstances here, and since [plaintiffs have] conceded that they did nothing to bring the alleged violations of the contract to the attention of [Capitol Federal], then in my view, that provision of the contract has been violated.

"Case law in Kansas is very clear that in contract situations Notice Provisions contained within the contracts are upheld. I'm aware of no case law that would indicate to me that any Court in Kansas or otherwise has told me that a 30-day Notice Provision in the Banking Account Agreement is an improper Notice Provision.

"And for those reasons I'm going to find that [plaintiffs have] failed to demonstrate to me that [they have] a cause of action for that reason. I want to expressly make clear that my ruling here today granting the Motion to Dismiss is not based upon any thought upon any—upon the merits of either [plaintiffs' breach of contract claims]. It deals specifically with the Notice Provision."

Plaintiffs timely appealed the district court's dismissal of their breach of contract claims against Capitol Federal for failing to comply with the Account Agreement's 30-day notice provision.

13

*Did the district court err by granting Capitol Federal's motion to dismiss plaintiffs' breach of contract claims?*

*Applicable Law*

The parties seem to agree on our standard of review when reviewing whether a district court erred by granting a motion to dismiss for failure to state a claim under K.S.A. 60-212(b)(6):

> "Whether a district court erred by granting a motion to dismiss for failure to state a claim is a question of law subject to unlimited review. *Campbell v. Husky Hogs*, 292 Kan. 225, 227, 255 P.3d 1 (2011). Additionally, when a district court has granted a motion to dismiss for failure to state a claim, an appellate court must accept the facts alleged by the plaintiff as true, along with any inferences that can reasonably be drawn therefrom. The appellate court then decides whether those facts and inferences state a claim based on plaintiff's theory or any other possible theory. If so, the dismissal by the district court must be reversed. *Zimmerman v. Board of Wabaunsee County Comm'rs*, 293 Kan. 332, 356, 264 P.3d 989 (2011)." *Cohen v. Battaglia*, 296 Kan. 542, 545-46, 293 P.3d 752 (2013).

Of note, K.S.A. 2023 Supp. 60-209 addresses specific rules for plaintiffs when pleading special matters. Subsection (c) states that when pleading a condition precedent, a plaintiff need only "allege generally that all conditions precedent have occurred or have been performed." K.S.A. 2023 Supp. 60-209(c).

Whether the district court erred in its interpretation of a contract is also a question of law over which this court exercises unlimited review. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018). As a result, this court exercises unlimited review when determining whether the district court correctly interpreted a contractual provision as ambiguous. 308 Kan. at 936. But some issues involving interpreting a contract involve

questions of fact. For instance, "[w]hether contractual performance is based on a condition precedent is a question of fact." *James Colborn Revocable Trust v. Hummon Corp.*, 55 Kan. App. 2d 120, 125, 408 P.3d 987 (2017).

When interpreting a contract, the primary rule is to interpret the contract as the contracting parties intended. *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). If the plain language of the contract provision at issue is clear and unambiguous, this court should interpret the contract provision as clearly and unambiguously written. 302 Kan. at 104. For ambiguity to exist within a contract, the contract's provisions or language must have "'doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language.'" *Geer v. Eby*, 309 Kan. 182, 192, 432 P.3d 1001 (2019). According to our Supreme Court, a contract is ambiguous if after applying the rules of contractual construction, a court is "'genuinely uncertain which one of two or more meanings is the proper meaning.'" 309 Kan. at 192. When this court determines that disputed contractual language is ambiguous, our Supreme Court's standard requires this court to strictly construe any ambiguous language against the drafter of the contract. *Botkin v. Security State Bank*, 281 Kan. 243, Syl. ¶ 7, 130 P.3d 92 (2006). Interpreting a contract in this manner is also "supported by a common-law rule that a court should construe the terms of a writing against the drafter." *Daggett v. Board of Public Utilities*, 46 Kan. App. 2d 513, 520, 263 P.3d 847 (2011) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63, 115 S. Ct. 1212, 131 L. Ed. 2d 76 [1995]).

At the same time, this court is not to interpret a contract provision in an unreasonable manner. Instead, it should construe the provisions of a contract in a manner that is consistent with the entire contract. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). This means that this court should not interpret one provision within a contract in a way that renders other provisions or language within the contract meaningless. 296 Kan. at 963. "'Results which vitiate the purpose or reduce the terms of the contract to an absurdity should be avoided. The

15

meaning of a contract should always be ascertained by a consideration of all pertinent provisions and never be determined by critical analysis of a single or isolated provision.' [Citations omitted.]" *In re Estate of Einsel*, 304 Kan. 567, 581, 374 P.3d 612 (2016).

Lastly, it is worth noting other than citing Kansas' standards for reviewing motions to dismiss and contract interpretation, plaintiffs frequently rely on federal district court decisions. Additionally, one of Capitol Federal's complaints is that plaintiffs discussed no law, state or federal, addressing a contractual notice provision containing the term "improper charges." Nevertheless, the legality of APPSN and NSF fees as charged by banks in certain situations is a developing legal issue. It seems that just one Kansas appellate court has even mentioned either fee. See *Exchange State Bank v. Kansas Bankers Surety Co.*, 39 Kan. App. 2d 232, 236, 177 P.3d 1284 (2008) (a party was charged an NSF fee while addressing a different legal issue). It also seems that just 18 federal district courts have considered this specific issue regarding APPSN and NSF fees when reviewing the legality of those fees charged by different banks.

Nevertheless, plaintiffs' arguments hinge entirely on whether the district court correctly interpreted the term "improper charges" under the Account Agreement's notice provision when ruling on Capitol Federal's motion to dismiss. Kansas' longstanding precedent on reviewing motions to dismiss and interpreting language within a contract is undisputed. Thus, although the federal decisions that plaintiffs cite support that how and when banks impose APPSN and NSF fees on consumers is an ongoing issue of legal interest, those decisions have no bearing on the outcome of this appeal because plaintiffs' appeal turns on whether the district court correctly interpreted the term "improper charges" as meant under their Account Agreement with Capitol Federal when granting the bank's motion to dismiss.

16

*Analysis*

The district court granted Capitol Federal's motion to dismiss for one reason—because plaintiffs did not comply with the notice provision in Section G of the Accounting Agreement before suing Capitol Federal. Once again, during its ruling from the bench, the district court stated that it "want[ed] to expressly make clear that [its] ruling . . . granting the Motion to Dismiss is not based upon . . . the merits of either [plaintiffs' breach of contract claims]. It deals specifically with the Notice Provision." So, although Capitol Federal's Account Agreement contains numerous complex provisions, the only provision that we must interpret is the Account Agreement's notice provision.

The disputed portion of the notice provision under Part IV, Section G of the Account Agreement states:

> "Except as noted in the Electronic Funds Transfer Disclosures at Part V, Section H or other document applicable to electronic funds transfers, if your account statement contains any errors or improper charges, you agree to notify us of any such errors or improper charges within 30 days of the date on which we mailed or otherwise made the affected statement available to you. If you do not notify us within that time, you are barred from bringing any action against us that is in any way related to the errors or improper charges. If we honor an item drawn on your account that contains a forged signature or endorsement or is altered in any way, you agree to notify us of such forgery or alteration within 30 days of the date on which the forged or altered item was provided to you or, if the item was not provided to you, within 30 days of the date on which we mailed or made available to you the account statement that contained a description of the forged or altered item. If you do not notify us in the time and manner required by this Agreement, you are barred from bringing any action against us that is related in any way to the forgery or alteration. In any case, you are barred from bringing any action against us for multiple unauthorized signatures or alterations by the same wrongdoer if you do not notify us in writing within 30 days after we mailed or made available to you the account statement that contained the description of that same person's first forged or altered item drawn on your account.

17

"Failure to report a forged or altered item within the time frames set forth above shall be deemed conclusive proof that you failed to exercise reasonable care and promptness in examining the statements and items of your account and in notifying us after discovery of the forgery or alteration. Moreover, because you are in the best position to discover an unauthorized signature, an unauthorized endorsement, or a material alteration, you agree that we will not be liable for paying such items if these items were drawn without authority or altered so cleverly (as by unauthorized use of a facsimile machine or otherwise) that the lack of authorization or alteration could not be detected by a reasonable person and you were negligent in some respect. An item description appearing in an account statement will be deemed sufficient for purposes of this paragraph if it contains the item's number (or other identifier), amount, and date paid."

Part V, Section H contains additional rules that the consumer must follow when the consumer believes that his or her "consumer deposit account" has been charged with an unauthorized transaction. But neither party addressed this provision before the district court or on appeal. In addition, the plain language of Section H does not contain a notice provision preventing a consumer from suing Capitol Federal if the consumer does not timely notify the bank about "any errors or improper charges." Instead, Section H's plain language explains how much money the consumer may lose for an unauthorized transaction depending on how quickly the consumer notifies Capitol Federal about the unauthorized transaction. So, Section H is irrelevant for purposes of deciding this appeal.

Plaintiffs' overarching argument on appeal is that the district court violated the rules controlling when to grant a motion to dismiss and how to interpret a contract. In fact, although plaintiffs have listed their argument about the district court considering matters outside the scope of the pleadings as a separate argument, this argument is analogous to plaintiffs' first argument outlining each way the district court allegedly violated the rules on reviewing motions to dismiss and contract interpretation. To summarize, plaintiffs argue that the district court violated the following well-established rules of law when it granted Capitol Federal's motion to dismiss: (1) The district court

18

did not accept all of their alleged facts as true; (2) the district court considered matters outside the scope of the pleadings; (3) the district court did not interpret ambiguous language in the notice provision against Capitol Federal—the drafter; and (4) the district court wrongly added language into the notice provision by interpreting it from the perspective of the "accountholder." In making these arguments, plaintiffs also assert that because it was Capitol Federal's own policy to impose the APPSN and NSF fees, and because the bank insists that it could impose these fees on them, complying with the bank's notice provision would have been futile.

Capitol Federal counterargues that if this court were to reverse the district court and accept plaintiffs' interpretation of the notice provision, this court "would need to rewrite the contract." It argues that the district court correctly ruled that the term "improper charges" was unambiguous because it relied on the ordinary meaning of the words "improper" and "charges" when using the words in the notice provision. So, Capitol Federal argues that any consumer, including plaintiffs, should have known that under the notice provision's plain language, they had to report any complaints about the bank charging them APPSN fees and NSF fees.

Capitol Federal also argues that plaintiffs admitted that the term "improper charges" is unambiguous because in their pleadings and at oral arguments, they sometimes referred to the APPSN and NSF fees as "improper charges" or some variation of the term "improper charges." It contends that plaintiffs' "choice of words . . . illustrates that 'improper' and 'charges' are common, unambiguous terms." Based on this, it also seemingly contends that plaintiffs cannot successfully challenge the district court's alleged failure to accept the facts as alleged in their amended petition as true since they sometimes called the APPSN and NSF fees improper charges. It contests plaintiffs' assertion that the district court had to accept its allegations that they performed all their obligations under the Account Agreement as true because other evidence contradicted this argument.

19

In addition to the preceding arguments, Capitol Federal rejects plaintiffs' contention that the district court considered matters outside of the pleadings by questioning plaintiffs' counsel about what plaintiffs did to comply with the notice provision. Instead, it argues that because plaintiffs argued that they had no duty to notify them about any issue regarding their APPSN and NSF fee charges before suing them, whether plaintiffs complied with the notice provision was properly before the district court. For this same reason, it argues that plaintiffs invited the alleged error the district court committed by questioning their counsel about the notice provision. As for plaintiffs' argument that complying with the notice provision would have been futile, Capitol Federal responds that their argument is inadequately briefed and speculative.

But a review of the applicable law as applied to the district court's ruling shows that the district court violated the law controlling when to grant a motion to dismiss and how to construe contracts.

In plaintiffs' amended petition, they alleged that they had "performed all of their obligations pursuant to Capitol Federal's agreements" without ever specifically addressing the notice provision. While alleging that they performed all obligations under Capitol Federal's Account Agreement, they also argued that they had no duty to report the APPSN and NSF fees to the bank, or that doing so would have been futile, because the fees were "part of [Capitol Federal's] systematic and intentional assessment of fees." Thus, in their amended petition, plaintiffs alleged the following:  (1) that they had performed their obligations under the Account Agreement; (2) that Capitol Federal systematically and intentionally charged people, including them, with impermissible APPSN and NSF fees; and (3) that reporting the fees as errors to Capitol Federal would have been futile. *Put another way, in their amended petition, plaintiffs pleaded that they had performed all of their required obligations under the Account Agreement before suing Capitol Federal given the specific facts of their case.*

From the bench, after recognizing that it sometimes acted as "the devil's advocate on some things," the district court questioned plaintiffs' counsel about the notice provision at length. The district court's first question to plaintiffs' counsel during this inquisition was about whether plaintiffs had attempted to comply with the notice provision because it had not found such allegation in their amended petition. At this point, plaintiffs' counsel repeated plaintiffs' claim within their amended petition. He responded that plaintiffs never made such an allegation because their position was that the notice provision did not apply to impermissible fees that Capitol Federal intentionally charged them. Their position was that the APPSN and NSF fees did not constitute "errors or improper charges" that they had to notify Capitol Federal about since the bank, itself, intentionally charged the fees. Later on, the district court also recognized that there is a difference between a statute of limitations and a notice provision in a contract.

A "statute of limitations" is a "law that bars claims after a specified period." Black's Law Dictionary 1707 (11th ed. 2019). So, issues involving statute of limitations are questions of law resolved by two facts that are usually undisputed:  (1) when the plaintiff's injury occurred; and (2) when the plaintiff filed suit against the defendant. On the other hand, a notice provision in a contract may not necessarily be a pure question of law. Contracting parties may draft a notice provision with whatever conditions they desire. It is the contractual notice provision's plain language that determines whether the provision is essentially a statute of limitations within a contract or whether the provision includes additional steps that the plaintiff must complete before suing the defendant.

When parties dispute whether the plaintiff followed a contractual notice provision containing additional steps that the plaintiff must follow before suing the defendant, a factual dispute before the district court about whether the plaintiff complied with those additional conditions could arise. Indeed, this is why this court has held whether contractual performance depends on a condition precedent constitutes a question of fact. See *James Colborn Revocable Trust*, 55 Kan. App. 2d at 125.

21

Here, the condition precedent within Section G's notice provision is whether a consumer's "statement contains any errors or improper charges." This means that Section G's notice provision applied to only a consumer whose statement contained any errors or improper charges. Yet clearly, the parties have always disagreed on whether the APPSN and NSF fees constitute improper charges. This was the main issue addressed in Capitol Federal's motion to dismiss.

As a result, unless the Account Agreement clearly and unambiguously explained that APPSN and NSF fees were improper charges, the district court should have denied Capitol Federal's motion to dismiss because plaintiffs' amended petition alleged that they had performed all their required obligations under the Account Agreement before suing Capitol Federal under the specific facts of their breach of contract claims. *Put another way, unless the Account Agreement clearly and unambiguously explained that a consumer must challenge APPSN and NSF fees under Section G's notice provision, the district court erred by not accepting the facts as alleged by plaintiffs in their pleadings as true when it granted Capitol Federal's motion to dismiss*. See *Cohen*, 296 Kan. at 545-46 (a court must accept a plaintiff's alleged facts as true when considering a defendant's motion to dismiss).

At this point, it is important to recognize that because plaintiffs attached the Account Agreement to their amended petition, Capitol Federal correctly argues that the district court could rely on the Account Agreement when ruling on its motion to dismiss. See K.S.A. 2023 Supp. 60-210(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). It is also important to recognize that although plaintiffs argue that the district court turned Capitol Federal's motion to dismiss into a motion for summary judgment by directly asking their counsel whether they had provided the bank notice as meant under Section G, Capitol Federal correctly argues that plaintiffs' counsel never objected to the district court's questions about whether they complied with the notice provision. In addition, when given the opportunity by the

22

district court to explain why plaintiffs believed that Capitol Federal had introduced matters outside the pleadings—an argument it made in its response to Capitol Federal's motion to dismiss—plaintiffs' counsel conceded that he did not believe that the bank had introduced facts outside the pleadings to make their arguments. Then, to the extent that plaintiffs' arguments involve either the district court or Capitol Federal raising matters outside the pleadings, those arguments are not properly before this court. Plaintiffs' counsel's failure to object to the district court's questioning and concession that Capitol Federal had not relied on matters outside the pleadings to support its motion to dismiss amounts to invited error. See *Water Dist. No. 1 of Johnson Co. v. Prairie Center Dev.*, 304 Kan. 603, 618, 375 P.3d 304 (2016) (a party cannot invite error and then complain about that error on appeal).

All the same, plaintiffs correctly argue that the term "improper charges" as explained in the Account Agreement is ambiguous. To review, from the bench, the district court determined that the term improper charges was unambiguous because the term tells an account holder that if the account holder discovers a problematic charge on his or her account statement, the account holder must promptly raise the problem with Capitol Federal. It determined that plaintiffs had to follow Section G's rule about giving Capitol Federal notice of their problems with the APPSN and NSF fees before plaintiffs could sue the bank for charging them those fees. Then, the bank told plaintiffs that it thought their argument why the term improper charges did not include intentional fees charged by a bank was "a distinction without a difference." In essence, the district court adopted the argument that Capitol Federal continues to make on appeal. It ruled that the term "improper charges" is unambiguous because the words "improper" and "charge" are broad enough to include any charge that the consumer believes he or she should not be charged with.

In reaching this ruling, however, the district court violated several rules of law. The term "improper charges," in and of itself, is very broad and ambiguous. Improper

23

charges may result from a variety of consumer transactions—checks, debit cards, or other electronic transactions. Also, the term "improper charges" is not defined under the Account Agreement. Then, the meaning of the term "improper charges" is not inherently clear, which was the district court's ruling. As a result, the district court's reason for granting Capitol Federal's motion to dismiss was erroneous. See *Waste Connections of Kansas, Inc.*, 296 Kan. at 963 (holding that courts should not construe contractual terms by isolating a single sentence or a single provision).

Because the term "improper charges," in and of itself, is ambiguous, the district court should have considered the context of the term "improper charges." But it did not. The district court's decision to grant Capitol Federal's motion to dismiss hinged entirely on its ruling that the term "improper charges" clearly and unambiguously required plaintiffs to notify Capitol Federal of their respective complaints before suing the bank.

If the district court had further analyzed the notice provision's plain language, as it should have, it would have noted that after the language discussing how many days a consumer has to notify Capitol Federal of an improper charge, Section G addresses transactions involving forgery and alterations. Nothing within the plain language of Section G addresses bank fees. So, in context, the plain language of the notice provision tells a consumer that if the consumer believes that his or her statement shows an improper charge, like a forgery or alteration, that consumer must notify Capitol Federal of the apparent errors or improper charges. See *Waste Connections of Kansas, Inc.*, 296 Kan. at 963 (courts should construe contractual terms in a reasonable manner). So, contrary to the district court's ruling otherwise, nothing within the plain language of the notice provision clearly and unambiguously proves that the disputed bank fees are a type of charge that a consumer must report to Capitol Federal under the Account Agreement.

Also, other nearby sections of the Account Agreement explicitly address fees. Again, Section G falls under Part IV of the Account Agreement. Although Section G

never mentions fees of any kind, Section G is surrounded by sections that discuss fees. Section E is a specific provision on Capitol Federal's fees, service charges, and balance requirements. Section F notes that the order in which the consumer makes withdrawals is not necessarily the order in which it posts a consumer's transactions, which "may affect whether or not [the consumer] incur[s] an overdraft or NSF/overdraft fees." And Section H is a specific provision on what happens when a consumer has insufficient funds, uncollected funds, and overdrafts. It provides that in such circumstances, Capitol Federal may impose "NSF/overdraft and other fees."

Simply put, the fact that the provisions surrounding Section G discuss fees and Section G never mentions fees supports that Section G's notice provision does not apply to situations where a consumer challenges a fee that the bank intentionally charged to his or her checking account. If this court were to interpret the term improper charges as applying to Capitol Federal's fee charges, this court would have to ignore that the bank included no language about bank fees in Section G but included specific language about imposing overdraft and NSF fees in Sections E, F, and H. Although on appeal, Capitol Federal repeatedly asserts that plaintiffs' interpretation of the Account Agreement would require this court to rewrite the notice provision, Capitol Federal's interpretation of the notice provision ignores that Section G never states that a consumer must report a disputed bank fee under the notice provision. Likewise, Capitol Federal's interpretation of the notice provision ignores that because the sections in the Account Agreement expressly address bank fees, it follows that Capitol Federal purposely excluded bank fees that it charged as a transaction that a consumer must report to Capitol Federal under the notice provision.

Hence, if anything, the plain language of Section G's notice provision as well as its context supports that bank fees are not charges that a consumer must timely report to Capitol Federal before suing the bank for charging the bank fees. In turn, although Capitol Federal asserts that the term "improper charges" as well as the entire notice

25

provision clearly directed plaintiffs to tell the bank about their complaints within 30 days, this is wrong. Section G's plain language never addresses charging bank fees that the consumer disagrees with if the consumer fails to timely notify Capitol Federal about those fee charges. The surrounding sections of the Account Agreement address when a consumer may be charged bank fees.

Given the preceding, the district court's conclusion that the term "improper charges" clearly and unambiguously included APPSN and NSF fee charges was error. Although the district court stated that plaintiffs were making a distinction without a difference, there is a clear distinction between the "improper charges" that a consumer must timely report to Capitol Federal under Section G's notice provision and the APPSN and NSF fee charges that the bank imposed as punishment for lacking funds to pay for a transaction. In any case, because Capitol Federal drafted the Account Agreement and the term "improper charges" is ambiguous, the district court had to interpret this ambiguous language against Capitol Federal. See *Botkin*, 281 Kan. 243, Syl. ¶ 7. Thus, as the bank, the burden or obligation was on Capitol Federal to define the important terms contained in the Account Agreement. As quoted by this court in *Daggett* when discussing the United States Supreme Court's decision *Mastrobuono*, the purpose of the common-law rule to construe disputed contractual language against the drafter "'is to protect the party who did not choose the language from an unintended or unfair result.'" *Daggett*, 46 Kan. App. 2d at 520. To paraphrase the *Daggett* court, in this case, the district court erred in its interpretation of Section G's notice provision because giving Capitol Federal the benefit of its own interpretation would subject consumers to unfair results. See 46 Kan. App. 2d at 520.

CONCLUSION

When reviewing a motion to dismiss for failure to state a claim, a court must accept the facts alleged by the plaintiff as true, along with any reasonable inferences

26

stemming from those alleged facts. *Cohen*, 296 Kan. at 545-46. And when reviewing contested language in a contract provision, a court must interpret the provision reasonably and in a manner that is consistent with the entire contract. *Waste Connections of Kansas, Inc.*, 296 Kan. at 963. Here, plaintiffs pleaded that they had performed all their contractual obligations to Capitol Federal in their amended petition. Although the district court adopted Capitol Federal's argument that plaintiffs violated the notice provision because the provision clearly told them to contact the bank before suing, a review of the notice provision's language undermines Capitol Federal's argument and the district court's ruling.

The term "improper charges," in and of itself, is ambiguous. Also, the term "improper charges" is ambiguous within the context of the Account Agreement. In a nutshell, (1) because plaintiffs pleaded that they had met this condition precedent under the specific facts of their case and (2) because the term "improper charges" in Section G's notice provision is ambiguous, the district court should not have questioned plaintiffs' attorney about plaintiffs' compliance with the notice provision at the motion to dismiss hearing. Rather, the district court should have accepted the facts as alleged by plaintiffs as true when ruling on Capitol Federal's motion to dismiss. Although the district court had unlimited review to determine whether the notice provision was ambiguous, it never recognized that the term "improper charges" is a condition precedent that required it to consider whether, in fact, plaintiffs timely notified Capitol Federal about their fee complaints before suing. See *James Colborn Revocable Trust*, 55 Kan. App. 2d at 125 (whether contractual performance is based on a condition precedent constitutes a question of fact); see also K.S.A. 2023 Supp. 60-209(c) (explaining that when pleading conditions precedent, plaintiffs may generally allege that they performed the condition precedent).

So, measured by the standard that the district court must accept plaintiffs' notice pleadings as true, the district court erred when it engaged in fact-finding at the motion to dismiss hearing. It should have accepted plaintiffs' notice pleadings that they followed the

Account Agreement's procedures before suing Capitol Federal. The term "improper charges" was ambiguous. In fact, the parties and the district court's extensive discussion of whether Capitol Federal's APPSN fees and NSF fees constituted improper charges proved that the term "improper charges" could be interpreted more than one way. See *Eby*, 309 Kan. at 192 (if a disputed term could reasonably be interpreted to have two or more meanings, then that term is ambiguous). Thus, when evaluating whether plaintiffs had to comply with the condition precedent to timely notify Capitol Federal of improper charges listed on their account statements as required under Section G's Account Agreement's 30-day notice provision, this determination would have obviously involved a question of fact. "Whether contractual performance is based on a condition precedent is a question of fact." *James Colborn Revocable Trust*, 55 Kan. App. 2d at 125.

Then, the district court erred when it engaged in fact-finding at the motion to dismiss hearing. In summary, because the district court made the preceding errors when it granted Capitol Federal's motion to dismiss plaintiffs' breach of contract claims, we reverse the district court's decision and remand for further proceedings consistent with this opinion.

Reversed and remanded with directions.